**GENTEX CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 03–728C.

United States Court of Federal Claims.

Filed Under Seal Dec. 3, 2003.

Reissued: Dec. 10, 2003 [1].

---

1. An unredacted version of this opinion was issued under seal on December 3, 2003. The

opinion issued today incorporates the parties' jointly proposed redactions. This redacted material is represented by brackets [ ].

Frederick W. Claybrook, Jr., Crowell & Moring, Washington, D.C., for Plaintiff.

William Kent Olivier, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant. Bryan O'Boyle, and Clarence Long, III, Air Force Legal Service Agency, Of Counsel.

Ron Ray Hutchinson, Doyle & Bachman, Washington, D.C. for Intervenor.

## *OPINION*

WILLIAMS, Judge.

This post-award bid protest is before the Court on the parties' cross-motions for summary judgment upon the administrative record.[2] Oral argument on the motions was held on September 3, and the parties completed briefing on October 23, 2003. Gentex Corporation (Gentex) challenges the Air Force's award of a contract to Scott Aviation (Scott) for the development of aircrew masks to provide protection for military aircrew in a chemical or biological warfare environment.[3] Plaintiff asks this Court to issue a permanent injunction and a declaratory judgment terminating the award to Scott and directing award to it, or in the alternative, ordering the Air Force to conduct a fair and equal reprocurement. Gentex also seeks its bid and proposal costs in the amount of [ ].

Gentex contends that two prejudicial errors occurred in this procurement. First, it claims that the Air Force awarded to an ineligible contractor, but the record does not support this conclusion. Second, Gentex contends that the Air Force improperly evaluated Scott's noncompliant battery solution as an advantage under "cost as an independent variable" (CAIV) principles, allowing Scott to "trade off" its noncompliance for lowered cost, while Gentex was not informed that this could be done. Because neither the RFP nor the Government's discussions alerted Gentex that CAIV tradeoffs would be evaluated in making the award decision, but the Air Force's discussions with Scott invited such a trade-off, the Court agrees with Gentex that the evaluation was unfair.

The Court is cognizant of its limited scope of review in bid protest cases. Nonetheless, the record here establishes that the Air Force violated Federal Acquisition Regulation (FAR) 15.306(e) by its unequal treatment of the offerors—a violation which prejudiced Gentex as the only other technically acceptable offeror. This Court is also mindful of the heavy burden a plaintiff must meet in order to secure injunctive relief. Given the nature of this violation, an appropriate injunction would not be a directed award, but rather a directive to the Air Force to amend the solicitation to accurately reflect the Air Force's needs and to seek and evaluate another round of final revised proposals. Because the public interest, in particular, the safety of our nation's aircrew, could be compromised by the delay in this procurement which would result from such an injunction, we deny injunctive relief.[4] However, the Air

**2.** In addition to moving for judgment on the administrative record pursuant to RCFC 56.1, Plaintiff has also moved for summary judgment pursuant to RCFC 56, contending that submission of supporting affidavits is permitted by that rule without stipulation or order of the Court. As explained *infra*, the invocation of Rule 56 does not automatically entitle a party to supplement the administrative record in a bid protest. The parameters of this Court's record in a bid protest are dictated by the Court's jurisdictional grant to review these actions, 28 U.S.C. § 1491(b), which requires that the Court review the agency's decision pursuant to the standards in the Administrative Procedure Act, 5 U.S.C. § 706.

**3.** Plaintiff unsuccessfully protested this award at the General Accounting Office (GAO). Although

GAO decisions are not binding on this Court, the Court recognizes GAO's longstanding expertise in the bid protest area and accords its decisions due regard. *Integrated Business Solutions, Inc. v. United States*, 58 Fed.Cl. 420 (2003) (citations omitted). In this case, Gentex's allegation regarding the unfair evaluation of Scott's noncompliant battery solution and CAIV tradeoff was not as fully developed at GAO as it has been in this forum.

**4.** Lt. General Reynolds, the head of the Air Force's contracting activity, issued a determination that performance of this contract was urgent and compelling and in the best interest of the United States. As such, the GAO's stay of the procurement was overridden, and the contract

Force did not conduct this procurement on a level playing field, and Gentex is not without a remedy. Gentex may recover its reasonable proposal preparation costs in an amount to be determined in further proceedings.

### Background

The following factual background is derived from the administrative record (AR), as minimally supplemented by the affidavits of Plaintiff's vice president and general manager.[5]

### The Joint Service Aircrew Masks (JSAM) Program

The JSAM program is a chemical, biological, radiological and nuclear defense program managed by the Air Force to develop, manufacture, field and sustain a mask system that, in conjunction with a below-the-neck clothing ensemble, will provide a capability for aircrew to fly in an actual or perceived chemical/biological (CB) warfare environment. The JSAM consists of a hood, mask, oral-nasal mask, and lens assembly that is supplied with filtered air through a battery-powered blower system. The blower component of the mask is a critical component.

This acquisition is a follow-on to the Program Definition and Risk Reduction (PDRR) procurement, in which two contracting teams, one led by Gentex, and one led by SAIC with Scott as a subcontractor, developed prototypes which became the basis for design development.

### The PDRR Phase

Under the Request for Proposals (RFP) in the PDRR phrase of this procurement, offerors were to develop a preliminary design or prototype of the mask, perform engineering studies, develop test articles for Government evaluation and reduce technical risk. Paragraph H–5.A of the PDRR RFP advised offerors that the Air Force intended to

"down select to one [PDRR] contractor to perform JSAM [SDD] ... and production effort." AR at 71.

CAIV tradeoffs were not evaluated in the PDRR phase of this procurement. However, both offerors proposed to implement CAIV analyses as part of their management processes to reduce costs, and the Air Force evaluated each offeror's proposed CAIV process under the management criterion.[6]

In their PDRR proposal, SAIC and Scott proposed that Scott would be the prime contractor during the SDD and production phase. This approach was evaluated by the Air Force in the PDRR acquisition, and the fact that Scott planned to be the prime contractor was expressly noted by the Source Selection Authority (SSA) in the source selection decision for the PDRR awards. In July 2000, the Air Force awarded PDRR contracts to two contractor teams, SAIC with Scott as a subcontractor, and Gentex with its subcontractors.

### The Presolicitation Notices for the SDD Phase of the Procurement

On May 9, 2001, the Air Force issued a notice of the upcoming solicitation for the SDD and production phase. This presolicitation notice stated that the Government intended to enter into full and open competition for the SDD phase, and specified that "[CAIV] principles [would] be used to meet technical requirements at a price the user is willing to pay." AR at 76–77. On May 31, 2002, the Air Force issued a second presolicitation notice reiterating this statement about CAIV principles and alerting offerors that they had to submit funding documentation to support their pro rata share of Government testing by June 30, 2001, system design information by September 30, 2001, test samples by October 31, 2001, and prototypes by January 30, 2002.

continued to be performed while the protest was contested before the GAO and this Court. Plaintiff did not seek a temporary restraining order or a preliminary injunction in this action.

5. As explained below, the Court grants Plaintiff's Protective Motion to Allow Affidavits. The administrative record agreed to by the parties is extensive in this case, containing 25 volumes and 13,472 pages. This record consists of all materials submitted in Gentex's protest to the GAO, including a transcript of the hearing. References to the administrative record are designated as AR followed by citations to the bates-stamped page number(s).

6. Defendant's Response to Court's October 7, 2003 Order at 4.

### Gentex's Request for Information On Other Offerors

On June 13, 2002, Gentex sent a letter to the Air Force Contracting Officer (CO) asking the Air Force to confirm the following:

1) We assume through the coordinated PDRR evaluations that only the two PDRR incumbents submitted the PDRR test articles for test.

2) JSAM SDD/Production proposals from contractors other than the two current PDRR prime contractors, Gentex and SAIC, would not meet minimum criteria in the selection process.

AR at 137. In an e-mail dated September 13, 2002, Gentex repeated this request. The CO responded that the proposals had not yet been received and that information concerning the identity or number of offerors was source selection information which could not be revealed.[7]

### The SDD RFP

On June 18, 2002, the Air Force issued request for proposals (RFP) number F-41624–02–R–1007 for the SDD phase of this procurement. The solicitation provided for the award of a cost-plus-award-fee contract with fixed-price incentive options for production quantities.

The JSAM Performance Specification was incorporated by reference in the RFP and its provisions were to be incorporated as contract terms upon award. The Performance Specification provided in pertinent part:

**1. SCOPE**

**1.1 IDENTIFICATION**

This document establishes the performance and verification requirements for the Joint Service Aircrew Mask (JSAM) system.

. . . .

**1.3 DOCUMENT OVERVIEW**

Key performance parameters (KPP's) are identified in Section 3 with a large bold asterisk (*). A threshold requirement is identified herein as a sentence with a form of the verb "shall" and is identified with a number in a set of brackets ( [ ] ). Where applicable, an objective requirement is identified in a set of braces ({ }) . . . . Appendix L contains a prioritized list of non-KPP requirements. Definitions for selected items are provided in Appendix B. The definitions in Appendix B apply only to this specification and shall be the determining factor(s) when interpreting any word or combination(s) of words.

AR at 1861.

Appendix B to the Performance Specification defined Threshold Requirements as follows:

Minimum capabilities or characteristics required to satisfy the user's need. They are identified by brackets ( [ ] ) in the body of this document.

AR at 1909. The solicitation did not define the term "cost as an independent variable."

Objective requirements were defined in Appendix B as:

Desired capabilities or characteristics which exceed the threshold requirements. They are identified by braces ({ }) in the body of this document.

AR at 1909. According to Major Whitehurst, the chief of the JSAM source selection team and the program manager, a threshold requirement was "the minimum requirement," and an objective requirement was something "we would really like to reach." AR at 12,-914.

Appendix L to the Performance Specification, Prioritized Requirements, provided:

The following is a prioritized listing of JSAM performance requirements. There are four categories of requirements, defined as follows:

KPP Key Performance Parameters (Absolute "must meet" requirements, non-tradeable)

A High priority requirements

B Medium priority requirements

C Low priority requirements. Includes all "objective" requirements.

Requirements are prioritized within A, B and C categories.

Affidavit of Robert F. McCay dated April 28, 2003 (First McCay Affidavit), ¶ 5.

---

7. Gentex disputes this, contending that the Air Force never responded to this correspondence.

AR at 1944. Section 3.4 of the Performance Specification, Functional and Performance Requirements, listed 178 requirements.[8] Of those, six requirements not at issue here were designated KPPs, and involved protecting against chemical and biological agents, as well as the fit and seal of the masks.

The following non-KPP requirements, listed in the performance specifications in order of priority, related to batteries:

[1] Any item of existing equipment which is modified for JSAM shall have performance equal to or better than the original equipment. Existing items which are replaced shall be replaced by items which have equal or superior performance.

AR at 1866. This was a category A high priority requirement.

### 3.4.11.1.1 TEMPERATURE

[110] Crew-mounted components of the system shall remain structurally intact and meet the performance requirements of this document during and after exposure to – 32C to +52C {Objective: –56C to +65C}. Crew-mounted components shall remain structurally intact and function for 5 minutes in temperatures as low as –56C in the event of high altitude ejection . . . .

. . . .

[132] **STORAGE TEMPERATURE:** The JSAM in its packaging shall meet the performance requirements of this document after exposure to a storage temperature range of –39C to 52C {objective of –56C to 71C}.

. . . .

### 3.3.14.1 RELIABILITY

[147] Battery power sources shall have an operational service life of at least 12 hrs {Objective of 16 hours operational service life}.

. . . .

### 3.4.14.8 SHELF LIFE

8. The list included 179, but one was removed.

[165] The JSAM in its packaging shall have a shelf life of up to and including 10 years {the objective is 15 years}.

AR at 1875–80. These were category B medium priority requirements.

### Section L—Instructions, Conditions and Notices to Offerors

Section L included the following pertinent provisions:

**Paragraph 2.6.9 Cost Or Pricing Information**

All cost or pricing information shall be addressed in the Cost Proposal and Contract Documentation Volumes. Cost trade-off information, work-hour estimates and material kinds and quantities may be used in other volumes only as appropriate for presenting rationale for alternatives or design and trade-off decisions . . . .

AR at 1794.

**Paragraph 4.2.1 PDRR Team Effort**

Each offeror shall provide a detailed assessment of their [sic] performance during PDRR . . . . The technical design identified in the proposal shall be critically compared to the actual delivered prototypes. While it is recognized that PDRR inherently involves tradeoffs, the basis for trades must be explained. Where your Cost as an Independent Variable (CAIV) process was used, you must compare the actual process with that proposed in the PDRR proposal.

AR at 1801.

**Paragraph 4.1.2.2—Technical Performance and Operation Utility**

Describe how the proposed designs will meet the following high priority non-KPP requirements . . . for each aircraft category. Your presentation shall clearly discuss how your design meets the following requirements . . ., rationale for not meeting a requirement (if applicable) and how you determine the optimal solution.

AR at 1797. A list of twenty-three requirements followed paragraph 4.1.2.2. This list

did not include the five performance specifications applicable to batteries quoted above.

### Paragraph 5.3 Cost as an Independent Variable

Offeror[s] shall describe their management approach for identifying tradeoffs to evolve a best value design. This includes a description of the tools or methodologies that will be used, why they were deemed appropriate for this program, and the method for documenting trade study results . . . .

AR at 1804.[9] Paragraph 5.3 was the only paragraph in the RFP which exclusively addressed CAIV, and it was contained in the RFP's instructions to offerors for preparing Volume III, Integrated Management Volume of their proposals.

### Paragraph 6.6 Operations and Support Instructions to Offerors for preparing the Cost Volumes

While Operations and Support (O & S) cost will not be included in any resulting contract, it is the intent of the government to evaluate cost based on Most Probable Life Cycle Cost (MPLCC). This will require the government to develop O & S costs based on information supplied by the offeror. Therefore, offerors shall use the O & S worksheet at Attachment 8, to list all time change/shelf life items and the five most expensive LCC replaceable parts of each variant. The government will use this information to compute the anticipated O & S cost for use in the LCC evaluation.

AR at 1813 (emphasis in original).

Attachment 8, the Operations and Support Cost Worksheet, advised offerors:

Complete the associated fields for each item to help identify key LCC [life cycle cost] drivers in the projected JSAM service life of fifteen years . . . .

AR at 1836. In the Government's example of a completed operations and support cost worksheet in Attachment 8, the first item listed was the battery.

### Paragraph 7.8 Exception to Terms and Conditions

Exceptions taken to terms and conditions of the model contract, to any of its formal attachments, or to other parts of the solicitation shall be identified. Each exception shall be specifically related to each paragraph and/or specific part of the solicitation to which the exception is taken. Provide rationale in support of the exception. and fully explain its impact, if any, on the performance, schedule, cost, and specific requirements of the solicitation . . . . Failure to comply with the minimum requirements, including terms and conditions, of the solicitation may result in the offeror being removed from consideration for award.

AR at 1816.

### Section M Evaluation for Award

Section M, which set forth the RFP's Evaluation Factors for Award included the following pertinent provisions:

### M001 Source Selection .

### a. Basis For Contract Award

The Government will select the best overall offer(s) based on an integrated assessment of Mission Capability, Proposal Risk, Past Performance and Most Probable Life Cycle Cost . . . . Contract(s) may be awarded to the offerors . . . whose proposals conform to the solicitation's requirements (to include all stated terms, conditions, representations, certifications, and all other information required by Section L of this solicitation) and are judged, based on the evaluation factors and sub-factors, to represent the best value to the Government, considering both cost and non-cost factors. The Government seeks to award to the offeror(s) who give the Government the greatest confidence that they will best meet or exceed the requirements affordably . . . .

. . . .

### M002 Evaluation Factors

a. *Evaluation Factors and Sub-factors and their Relative Order of Importance*
Award will be made to the offeror proposing the combination most advantageous to the Government based upon an integrated

---

9. This identical clause had been included in the PDRR solicitation at Paragraph L.4.1.3.

assessment of the evaluation factors and sub-factors described below ....

### FACTOR 1—Mission Capability

Sub-factor 1.1—Key Performance Parameters

Sub-factor 1.2—Technical Performance and Operational Utility

Sub-factor 1.3—Program Risk Mitigation

Sub-factor 1.4—Integrated Management

### FACTOR 2—Proposal Risk

Sub-factor 2.1—Key Performance Parameters

Sub-factor 2.2—Technical Performance and Operational Utility

Sub-factor 2.3—Program Risk Mitigation

Sub-factor 2.4—Integrated Management

### FACTOR 3—Past Performance

Sub-factor 3.1—PDRR Team Effort

Sub-factor 3.2—PDRR Prototype Quality

### FACTOR 4—Most Probable Life Cycle Cost (MPLCC)

b. *Factor and Sub-factor Rating*

Each sub-factor under the Mission Capability factor will be assigned a color rating. The color rating depicts how well the offeror's proposal meet the sub-factor requirements in accordance with the stated evaluation criteria and solicitation requirements ....

....

c. *FACTOR 1—Mission Capability*

Each sub-factor within the Mission Capability Factor will receive one of the following color ratings, based on the assessed strengths, inadequacies and/or deficiencies of each offeror's proposal as they relate to each of the Mission Capability sub-factors ....

| COLOR | RATING | DEFINITION |
|---|---|---|
| BLUE | EXCEPTIONAL | Exceeds specified minimum performance or capability requirements in a way beneficial to the Government. |
| GREEN | ACCEPTABLE | Meets specified minimum performance or capability requirements necessary for acceptable contract performance, but any proposal inadequacies are correctable. |
| YELLOW | MARGINAL | Does not clearly meet some specified minimum performance or capability requirements necessary for acceptable contract performance, but any proposal inadequacies are correctable. |
| RED | UNACCEPTABLE | Fails to meet specified minimum performance or capability requirements. Proposals with an unacceptable rating are not awardable. |

**(1) *Sub-factor 1.1—Key Performance Parameters***

The Government will evaluate the technical performance demonstrated by the PDRR prototypes and the potential for meeting System Specification Key Performance Parameters (KPP) requirements during System Demonstration (SD). The sub-factor is met when the offeror effectively and clearly demonstrates that the offeror's proposed design approach will meet the KPPs during formal qualification testing.

**(2) *Sub-factor 1.2—Technical Performance and Operational Utility***

The Government will evaluate the technical performance and operational utility of the proposed designs based on the criteria in Section L, paragraph 4.1.2. This evaluation will consider PDRR prototype performance; proposed design changes for SD; and an assessment of the impact of non-KPP threshold requirements which will not be met. This sub-factor is met when the offeror clearly and effectively demonstrates that the proposed design(s) will exhibit accept-

able performance both technically and in the operational environments.

. . . .

### f. *Factor 4—Most Probable Life Cycle Cost*

For purposes of the cost evaluation, Most Probable Total Life Cycle Cost (MPLCC) will be the amount used in the decision process. MPLCC will include: the total PDRR cost plus fixed fee, SDD cost plus award fee, Production fixed price incentive successive target analyzed price, and Operations and Support (O & S) costs based on replaceable/reparable baseline data . . . .

. . . .

The price/cost evaluation team will develop a probable cost of performance for each offeror. The probable cost may differ from the proposed amount since it is the Government's best estimate of the cost of any contract that is likely to result from the offeror's proposal. The probable cost shall be used for evaluation to determine the best value. The probable cost is determined by adjusting each offeror's proposed cost and fee, when appropriate, to reflect any changes (additions or reductions) in cost elements to realistic levels based on the cost realism analysis.

AR at 10,412–17.

### M005—Solicitation Requirements, Terms and Conditions

Offerors are required to meet all solicitation requirements, such as terms and conditions, representations and certifications, in addition to those identified as factors and sub-factors to be eligible for award. Failure to comply with terms and conditions of the solicitation may result in the offeror being removed from consideration for award. Any exceptions to the solicitation's terms and conditions must be fully explained and justified.

AR at 10,419.

In the RFP's cross-reference matrix, an attachment to the RFP, CAIV was cross referenced with Section M factors 1.1 through 1.4, *i.e.*, Key Performance Parameters—Technical Performance and Operational Utility, Program Risk Mitigation, and Integrated Management.[10]

ATTACHMENT 1: RFP CROSS REFERENCE MATRIX (RCMR) stated:

**For Prospective Offeror(s):** See paragraph 3.4 regarding instructions for completion of the solicitation RCRM. If this matrix conflicts with any other requirement, direction or provision of this solicitation, the other reference shall take precedence over this matrix. Additionally, to the extent this matrix discloses details as to the extent or manner by which the Government intends to evaluate Offeror's proposals for award, Section M references in the matrix are for information purposes only and the Government shall be obligated to evaluate proposals solely in conformance with the provisions of the Section M of the solicitation. Any reference to Factor 1 in the RCRM implicitly relates to an evaluation of Factor 2.

### RFP CROSS REFERENCE MATRIX

| | Section L Para No. | Section M Factor/Sub Factor(s) | | CWBS* | IMP* | Proposal* Vol/Para No. | CDRL* |
|---|---|---|---|---|---|---|---|
| 4.1.1–4.1.3 | Technical | 1 | 1.1–1.2 | | | | |
| 4.2 | Past Performance | 3 | | | | | |
| 4.1.3 | Risk Mgmt | 1 | 1.3 | | | | |
| 5.0 | Integrated Management | 1 | 1.4 | | | | |

**10.** In response to a question from the Court as to whether the RFP advised offerors that CAIV tradeoffs would be evaluated, the Government cited this matrix, stating:

[The] matrix provided a cross reference matrix that stated that CAIV would be evaluated under solicitation section M subfactors 1.1—1.4. Defendant's Response to the Court's October 7, 2003 Order at 5.

| | | | |
|------|------------------------|---|----------|
| 5.1 | Organization | 1 | 1.4 |
| 5.2 | Cost/Schedule Reporting | 1 | 1.4 |
| 5.3 | CAIV | 1 | 1.1–1.4 |
| 5.7 | IMP | 1 | 1.4 |
| 5.8 | IMS | 1 | 1.4 |
| 5.9 | CSOW | 1 | 1.4 |
| 5.10 | CWBS | 1 | 1.4 |
| 5.11 | Subcontracting | 1 | 1.4 |
| 6.0 | Life Cycle Cost | 4 | All |

AR at 10,387.

### Gentex's July 11 E–Mail Regarding Unaffordable O & S Costs

Before proposals were due on July 19, 2002, Gentex sent an e-mail to the Government stating that it believed its O & S cost worksheet would result in a seemingly unaffordable program:

> [W]hen multiplied by the unit prices of approximately [ ] and [ ] for the batteries and for the filter respectively, the life cycle costs approach [ ] for the batteries and [ ] for the filter. Correspondingly high numbers are also obtained for the other aircraft platforms. We believe that these costs are unrealistic .... [W]e are concerned about submitting cost data as described above since it will be added to our SD Costs to calculate MPLCC and result in a seemingly unaffordable program.

AR at 2201.

The Government did not respond to this e-mail prior to submission of initial proposals.

### Initial Proposals

Gentex and Scott were the only offerors to submit proposals by the July 19 due date. In its initial proposal, Scott proposed a lithium manganese dioxide battery pack as its battery solution at a price of [ ] per battery pack. In its initial proposal, Gentex proposed a type of battery pack that used lithium batteries, which was priced at [ ] per battery pack.

In its initial proposal, Gentex requested exceptions to two non-KPP threshold requirements of the performance specifications, [ ]. The Government subsequently denied these exceptions, stating "the offeror shall propose to the System Specification ... provided in the Request for Proposal [sic]." AR at 916.

In its initial proposal, Gentex indicated its understanding that the CAIV tradeoff would be performed after award. Gentex stated:

> A preliminary list of potential CAIV study areas, based on the top cost drivers, has been prepared and will be reviewed for viability with the government immediately *after* contract award. This initial list includes .... [T]he Gentex team is proposing that a CAIV/Affordability (C/AWG) working group be established with government participation, immediately *after* contract award, and that the first agenda items be the tentative list of CAIV analyses that have been developed. Initial CAIV trades should be started as soon *after* contract award as practical ....

AR at 907–08 (emphasis added).

Scott indicated in its proposal that its proposed design in connection with the ground communications unit might not meet one non-KPP threshold requirement. Scott did not take exception to this requirement, but indicated that if the unit did not meet the requirement, "a CAIV study [would] be undertaken to determine the optimum approach." AR at 11,371.[11]

---

11. Counsel for Scott represented that Scott's CAIV study with regard to this requirement would be done after award, stating that "Scott ... indicated that the item could be improved, if needed, to meet the requirement if the Government so decided after contract award based on a detailed study that could be performed during

*Oral Presentations*

Oral presentations were held during the weeks of July 29 and August 2, 2002. In its oral proposal, Gentex stated that the [ ] specification in performance specification [ ], a high-priority non-KPP threshold requirement, could not be met. This non-KPP threshold requirement stated that [ ].

During its oral presentation Gentex represented that it would do a CAIV study after award on its proposed conversation communication unit (CCU) [12] but that it was clearly meeting the CCU requirement in its proposal. Specifically, Gentex representatives stated that they proposed a CAIV study for [ ] related to the CCU, which would be implemented after contract award if the Government agreed. In response to a question during the oral presentation Gentex reiterated that every CCU in the proposal met the requirement.

*The August 28, 2002 E-mails Delineating the Assumptions for Evaluating the Batteries*

In a separate e-mail addressed to each offeror regarding "Battery Assumptions," the Government advised Gentex and Scott as follows:

The Government is using the following assumptions with regard to batteries:
— WEAR hours are assumed to be 50% training and 50% CB operations.
— Systems will be exposed to CB agents for three days during it's [sic] life.
— Cold weather operations is defined as below 32°degrees F or 0°degrees C.
— Cold weather operations will be assumed to be 10% of all wear hours.
— JSAM continuous wear over six hours will be assumed to be 25% of all wear hours and we will assume that aircrews plan for this duration.
— There will be no battery changes for JSAM wear under 12 hours at above 32°degrees F or 0°degrees C.

AR at 2212, 2214. Gentex did not understand this e-mail to be an attempt to change the performance specifications or the threshold requirements relating to batteries and their use. Gentex continued to understand that its battery approach would have to meet all of the operational and performance requirements and used the battery assumptions in the e-mail to prepare its O & S costing information for its fully compliant batteries.

*Discussions*

During discussions on September 1, 2002, the Air Force advised Scott as follows:

The Government considers the proposed MPLCC [most probable life cycle costs] to be unaffordable. What alternative batteries were considered? Were any CAIV studies conducted? Was use of rechargeable batteries or aircraft power (in platforms where available) considered?

AR at 1023. The Government did not advise Gentex during discussions that CAIV tradeoffs could be made pre-award or that any resultant cost savings would be evaluated. After submission of Gentex's initial proposal, the Government asked Gentex several questions relating to its proposed batteries, but none suggested that CAIV studies could have been conducted and evaluated in conjunction with proposing batteries.

*Final Proposal Revisions (FPRs)*

On September 24, 2002, the Air Force issued Gentex a request for final proposal revisions and stated that Gentex's "Initial Evaluation Brief dated 22 Aug 02 [would be] the established technical approach baseline." AR at 916. Under the heading "Exceptions to Terms and Conditions," the request stated that "[t]he offeror shall propose to the systems specification dated 14 June 2002 provided in [its] Request for Proposal." AR at 916.

Gentex and Scott timely submitted FPRs on September 28, 2002. In its FPR, Gentex removed its request for exceptions and re-

contract performance." Scott Aviation's Response to Court's October 6, 2003 Order at 25.

12. The CCU has also been referred to in the record as the communication control unit. Gen-

tex's Statement of Facts in Support of its Motion for Summary Judgment and Judgment on the Administrative Record, Attachment 30.

priced to full conformity. Gentex proposed two lithium battery packs, a four-cell lithium battery pack for the fixed-wing mask at a price of [ ] per battery pack and a two-cell lithium battery for the rotary-wing mask at a price of [ ] per battery pack.[13] The two-cell lithium manganese dioxide pack that Gentex proposed was not currently certified and in Government inventory, but was a newly developed pack.

In its final proposal, Scott offered two battery packs, a fully compliant lithium battery pack and an alkaline battery pack which did not meet 100% of the contract requirements. In particular, Scott's alkaline battery did not meet the requirements for:

1) performance in temperatures from −32C to +52C ability to function for 5 minutes as low as −56C in the event of high altitude ejection;

2) a 10–year shelf life;

3) performance after storage at temperatures of a range of −39C to 52C;

4) an operational service life of at least 12 hours;

5) performance equal to or better than original equipment when replacing original equipment.

Scott based its proposed life cycle costs on the assumption that alkaline batteries would be used 90 percent of the time in temperatures above freezing, and lithium batteries would be used the remaining 10 percent of the time. Scott's offer of alkaline batteries in this particular case was a CAIV initiative. Under Scott's dual-battery proposal, the aircrew would have to choose, prior to a given mission, which battery pack to insert into the mask. The mask could only accommodate one battery pack at a time, so Scott's proposal envisioned using noncompliant alkaline batteries in scenarios where full compliance might not be required.

Gentex was not aware that it could have proposed tradeoffs which would fail to achieve full specification compliance in return for cost savings during the proposal period. Gentex understood that the only permissible way to offer less than full compliance with

threshold requirements was to follow the procedures in the RFP's exceptions clause, L.7.8, and explain why a particular requirement could not be met. Gentex believed that if an exception was granted, a modification to the RFP would be issued, and if an exception was not granted, offers would be evaluated based on a requirement of full compliance with the minimum specifications.

### Scott's Compliance With Eligibility Requirements

SDD offerors were required to submit funding documentation to support their pro rata share of Government testing, as well as system design information test samples and prototypes. Scott's prototypes delivered, tested and funded as part of SAIC's PDRR contract were the same prototypes which were evaluated by the Air Force in the SDD phase.[14] The cost paid by the Government under SAIC's PDRR contract was included as part of the Most Probable Life Cycle Cost Evaluation in awarding the SDD/Production contract to Scott.

### The Evaluation

At the hearing conducted by the GAO, Major Whitehurst, the Chief of the Source Selection Evaluation Team and the JSAM Deputy Program Manager, who eventually became the Program Manager, explained the general approach the evaluators took to the technical requirements in this procurement. She testified that the Air Force was not "going to look at whether or not contractors or bidders met [the requirements] but we're also going to look at, if they didn't meet it, why. So if they have a valid justification as to why they are not meeting a requirement, and the Government accepts that, you're still able to meet the requirements of the evaluation." AR at 12,911.

Major Whitehurst explained:

So when we are looking at it, we knew that there were potentially some requirements that would not be met because, again, there was just a number of requirements. So when we were doing our evaluation, we looked at, in the event that you don't meet

---

**13.** The JSAM were to be produced in different variants for fixed-wing and rotary-wing aircraft.

**14.** Scott's role in the PDDR phase with SAIC was for prototype fabrication.

something, why you can't meet it and what are we gaining if you don't meet it. And so in this particular instance, there are some temperatures in which the alkaline battery is not effective but when you look at the overall cost and the fact that it does meet the requirements within a specific temperature range, the technical team, based on their assessment, felt that was something that the joint services could live with.

AR at 12,912.

Major Whitehurst testified that Scott's alkaline battery would not meet the requirement to be able to operate at minus 32 degrees centigrade to plus 52 degrees centigrade. She explained:

However, when we were evaluating, we were not evaluating whether or not the system specifically met a requirement. Again, if they did not meet a requirement—and the lithium manganese dioxide battery does meet that requirement. Why there may be a benefit for using this option. In standard operating temperatures, there was a cost benefit to using alkaline battery. And we weren't talking about operational. We're talking about there is a real threat there is a chemical attack. We're not talking about they're going to be wearing this mask when they fly every day

. . . .

AR at 12,923–24.

Major Whitehurst testified that the specifications required the system to function for five minutes in temperatures as low as minus 56 degrees centigrade in the event of high altitude ejection and that she was "almost positive" that the alkaline battery would not operate under that scenario, and in that case, the pilot or the airman would not have use of the blower. AR at 12,926. She recognized that Scott's alkaline battery solution was a CAIV tradeoff and explained:

As part of most major acquisition programs, you have what you call cost as an independent variable and so as you're developing, you have to take into account the life cycle cost, not only the development costs but also *once you get this thing out in the field,* how much is it going to cost to maintain it. And so *the alkaline batteries in this particular case are a cost as an independent variable initiative.* Again, the lithium manganese dioxide batteries, which meet the full range of the requirements, is part of the JSAM system. There is an alternative to using the alkaline batteries, like I said, during training and during certain temperature ranges. So it was not an independent just technical evaluation. You have to look at what are the technical benefits and what the cost ramifications or benefits of whatever decision you make.

AR at 12,932–33 (emphasis added). In its evaluation, the Air Force recognized that Gentex intended to perform CAIV tradeoffs post award, quoting an e-mail in which Gentex pointed out that, in its proposal, it had included candidate CAIV trades that would occur early in system development.

### The Source Selection Decision

In analyzing subfactor 1.2, Technical Performance and Operation Utility, the source selection decision characterized Scott's alkaline battery as a "significant advantage" and "noted strength" stating as follows:

**Battery Assembly**—This is a significant advantage because safety certification requirements for alkaline batteries are significantly reduced, the $LiMnO_2$ batteries are available in the existing inventory, and the alkaline batteries are non-hazardous materials resulting in less costly disposal. Use of less costly alkaline batteries was a noted strength.

AR at 9117.

In his summary of the evaluation, the source selection authority (SSA) highlighted four "key areas" in which Scott proposal led to a "clear and decisive choice" for Scott. With respect to the second of these four key factors, subfactor 1.2, the SSA stated:

Scott Aviation's approach demonstrates a greater value to the Government by utilizing an off-the-shelf battery assembly for cold weather and developing a low cost battery assembly for routine use. Scott is also relying on the more proven design as developed in the PDRR.

AR at 9129. The SSA further concluded that in reviewing the evaluation criteria, the Gentex proposal "does not warrant the [ ] premium proposed for costs," and that "both proposals met the minimum requirements called for in Section M of the RFP." AR at 9128–29. On November 26, 2002, the Air Force awarded the contract to Scott, stating that "MPLCC was a significant consideration in the selection decision." AR at 9105.

### The GAO Protest and the Override of the Stay

In accordance with 31 U.S.C. §§ 3551–3556, Gentex timely filed a protest at the General Accounting Office. On January 9, 2003, Lt. General Richard Reynolds, Commander and Head of the Contracting Activity, Aeronautical Systems Center, Air Force Material Command, Department of the Air Force, issued a determination pursuant to 31 U.S.C. § 3553(c)(2) overriding the GAO-ordered stay of performance of this contract "because performance of the subject contract is urgent and compelling and in the best interest of the United States ...." AR at 2615.

Lt. General Reynolds concluded that the stay of contract performance would have the following impact:

a. Delaying this program 90 days will delay providing simultaneous anti-G and CB protection to our high-performance aircrews in a single mask system, thus reducing their warfighting potential by exposing them to additional risks of CB exposure when using the current anti-G mask, or G-induced loss of consciousness when using the current CB mask. When added to rescheduling of program development and testing events, the present stay would lead to a 6–month delay of Initial Operational Capability (IOC). This delay would hinder the performance of our nation's aircrew warriors. In a memorandum dated 3 January 2003 (Atch 1), Air Combat Command (ACC) stated the following concern: "The JSAM provides AF aircrew members with the mid- and far-term aircrew NBC [Nuclear, Biological, and Chemical] protection solution meeting the Chief of Staff Air Force Task Force CONOPs objectives. Delaying this program may create extenu-

ating circumstances; aircrew members not having a continuous NBC protection program and systematically not meeting combat mission requirements."

b. The purpose of the JSAM acquisition program is to replace the existing aircrew CB protection masks currently fielded across the joint services. For the Air Force, the system is the Aircrew Eye–Respiratory Protection (AERP) system, today's solution for head, face, neck, and respiratory protection of the aircrew member in the CBRN environment. As noted by ACC, the JSAM program is an urgent requirement for the Air Force flying mission. The GAO-imposed 100–day delay would impact fielding/distribution and delay the current JSAM IOC date beyond September 2006. Although IOC is over 3 years away, current program schedule does not have available slack time to recover a delay of more than 30 days. The Air Force is currently in their last option year of procuring AERP systems. Thus, a 90–day delay would create a void in serviceable systems and lead to a shortage of AERP systems, thereby directly affecting flying mission capability. Additional AERP systems at a cost of $1683/system would need to be procured. Projected requirement for this delay in JSAM fielding is an additional unplanned and unfunded 688 AERP systems to replace those that reach their service life during this period of time. This equates to a cost impact of $1.16M.

c. A delay to the JSAM program would also affect planned activity of the F/A–22 and Joint Strike Fighter (JSF) programs. The F/A–22 program is currently waiting for the JSAM engineering specification to finalize the integration effort. The JSF program contractor has contacted Scott Aviation to schedule aircraft design meetings in January 2003. A stay of performance will delay this process. Cost and schedule impacts are unquantifiable at this time.

d. A delay to JSAM IOC to FY07 could necessitate unplanned aircraft modifications to accommodate AERP, such as with the F/A–22 and C–130J, at an estimated

total cost of $2.5M. Estimated costs are based on AERP aircraft modifications performed on F–16 and other C–130 aircraft. Funds to support this requirement would be service Operations and Maintenance (O & M) dollars not budgeted for, resulting in a need to offset O & M dollars intended to fund other mission requirements.

e. The U.S. Navy and U.S. Marine Corps are in their last option year of buying their current CB protective head-eye-respiratory systems, the AR–5, from Camlock UK Ltd. A JSAM fielding delay of 90 days would create a void in serviceable systems and lead to a shortage of AR–5s, which currently cost $6,500 each. Based on anticipated service-life expiration dates, a quantity of 246 AR–5 systems would be needed during this period of time. This equates to a cost impact of $1.6M. Funds to support this requirement would have to be pulled from each service's O & M accounts and would result in the sacrifice of other mission equipment needs.

f. A stay in contract performance of 90 days will cause a 6–month schedule slip at a cost of $2.5M to the program (contractor costs, increased government costs, and test costs). Additionally, a 7% increase in production costs is expected due to shifting of FY buy profiles. This cost information was derived from the program cost estimate and from Scott Aviation (Atch 2). If the stay were overridden, continuing contract performance would result in a cost avoidance of $7.76M. Based upon Scott Aviation's contracted effort, the Government has concluded the termination cost at the 30–day mark would be $400K and $1.6M at the GAO-scheduled decision point of 31 March 2003.

AR at 2621–22.

## Discussion
### Jurisdiction and Standard of Review

The Court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1). In a bid protest action, the Court reviews the defendant's decision under the standards in the Administrative Procedure Act (APA), 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4). The APA directs a re-

viewing court to overturn agency actions that are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

■ "The protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Information, Technology and Applications Corp. v. United States*, 51 Fed.Cl. 340 (2001) (*ITAC*) (*citing GraphicData LLC v. United States*, 37 Fed.Cl. 771, 779 (1997)), aff'd, 316 F.3d 1312 (Fed.Cir.2003). To prevail, the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it. *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996) (*citing LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1556 (Fed.Cir.1995)).

### Gentex's Motion to Supplement the Administrative Record

■ Gentex has filed a "protective motion to allow affidavits" seeking to supplement the record with two affidavits of its vice president and general manager, Robert F. McCay. Because bid protest actions are subject to the APA standard of review, the Court is generally limited to the administrative record, unless there is a genuine need to supplement that record arising from the particular circumstances. Indeed, it is well established that the focal point for judicial review in a bid protest "should be the administrative record already in existence, not some new record made initially by the reviewing court." *Cubic Applications v. United States*, 37 Fed.Cl. 339, 342 (1997) (*quoting Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)).

In the seminal case of *Cubic Applications v. United States*, 37 Fed.Cl. 339 (1997), this Court recognized that "extra-record" evidence could be considered in limited situations, such as those identified in *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989), including "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly" and "in cases where relief is at issue especially at the preliminary injunction stage." *Cubic*, 37 Fed.Cl. at 342.

The first McCay affidavit set forth Gentex's understanding of the RFP and the Government's August 28 e-mail, its belief that it could not have switched one of its subcontractors to be the prime contractor in the SDD phase, its belief that it could not have offered a dual-battery solution in which one battery was noncompliant as a CAIV trade-off, and the amount of its bid preparation costs.

In his second affidavit, Mr. McCay addressed the argument of the Air Force and Scott that Gentex should have known, by virtue of the August 28 2002, e-mail, that it could have offered noncompliant batteries for 90% of JSAM usage. Mr. McCay also addressed the substance of the override determination of Lt. General Reynolds and the matter of prejudice to Gentex. To the extent that Gentex's understanding of the nontechnical aspects of the RFP is reflected in Gentex's proposal and oral presentation already in the Administrative Record, this information is obvious to the Court and the other parties. As such, it is "useful, but innocuous because [it is] only a guide to documentary justification already in existence." *Cubic*, 37 Fed.Cl. at 342.

Gentex's understanding of the RFP requirements regarding CAIV studies and the Government's e-mail delineating the battery-use assumptions that would be taken into account in evaluating O & S costs illuminates complex issues and assists the Court in understanding the parties' positions. Therefore, it was appropriate for Plaintiff to provide additional information to enable the Court to understand this case clearly. *Id.; see also MVM. Inc. v. United States*, 46 Fed.Cl. 126, 135 n. 14 (2000).

Mr. McCay's testimony regarding Gentex's bid preparation and proposal costs clearly relates to the relief at issue and thus is a proper supplementation of the record. *Cubic*, 37 Fed.Cl. at 342. Testimony regarding the override determination also relates to the remedy sought, in that Gentex is requesting injunctive relief, and the factual predicate underlying the override determination is relevant to the public interest factor to be weighed in analyzing whether injunctive relief should be granted.

Finally, in attempting to demonstrate prejudice, Mr. McCay explains how Gentex would have changed its proposal were it not for the Air Force's illegal actions. Such an attempt to show prejudice is also an appropriate basis for supplementing the record. *See Strategic Analysis, Inc. v. United States Department of the Navy*, 939 F.Supp. 18, 23 n. 7 (D.D.C. 1996) (acknowledging that, while normally judicial review of a bid protest is limited to the administrative record, the submission of an affidavit of a company executive is a proper way to demonstrate prejudice) (*citing Data General Corp. v. Johnson*, 78 F.3d, 1556, 1563 (Fed.Cir.1996)).

The Court therefore permits the supplementation of the administrative record with the two McCay affidavits, but notes that, as with much of the post hoc GAO record, the Court may determine the degree of relevance to accord them. *See Cubic*, 37 Fed.Cl. at 346 (stating that while the Court has no choice but to accept post decisional agency statements in the GAO record, it has a choice regarding the degree of relevance to assign to them).

### Did the Air Force Improperly Award to an Ineligible Contractor?

Gentex contends that the Air Force had set up ground rules establishing that only the two companies who had served as prime contractors on the PDRR phase would be automatically eligible to be prime contractors in the SDD phase. While this concept that the Air Force intended to "down select" to one PDRR contractor for the SDD phase was set forth initially in the PDRR solicitation, the Government clearly and definitively changed the rules to open up the competition to any other vendors who could become eligible. The pre-solicitation notices advised other potential contractors that they could submit funding documentation, system design information, material, test samples, and prototypes by certain dates to establish their eligibility. Scott's efforts on the PDRR contract met these requirements in substance as all of this information was timely conveyed to the Government.

In its initial proposal, the SAIC/Scott team advised the Air Force that Scott would be

the prime contractor in the follow-on procurement. Furthermore, Scott's role in the PDRR phase was for prototype fabrication, and it was Scott's prototype that had been delivered, tested and funded as part of the SAIC team's PDRR contract. A conclusion that Scott was ineligible to be the prime contractor on SDD because it had been a subcontractor during the PDRR phase when it otherwise complied with the substantive requirements to be an SDD offeror would unduly restrict competition and elevate form over substance.

Gentex also faults the Air Force for not responding to its inquiries as to whether any other competitors had entered the ring. However, the Air Force was not required to inform offerors in this competitive acquisition of the universe of their competitors. The June 13, 2002 letter asking the Air Force to confirm that only the two incumbents which submitted test articles would meet the minimum criteria for selection was not an appropriate inquiry, given that the Air Force had expressed its intention to open up the SDD phase to be a competitive procurement.

### Did the Air Force Improperly Evaluate the Battery Solutions?

■ Three discrete circumstances in this procurement combine to make the competition unfair with regard to the evaluation of batteries. First, the RFP did not advise offerors that they could "trade off" noncompliance with non-KPP threshold technical requirements, have this evaluated as a CAIV initiative, and receive evaluation credit pre-award. Secondly, the Air Force's discussions with Scott (but not Gentex) suggested that a CAIV tradeoff could be done in the evaluation phase with batteries. Finally, Gentex's proposal and oral presentation made it clear to the Air Force that Gentex read the RFP to prohibit pre-award CAIV tradeoffs and to require compliance with all solicitation requirements. The Air Force did not disabuse Gentex of its fundamentally different interpretation of the RFP requirements and evaluation scheme and awarded to a vendor which had evidenced the opposite interpretation.

These errors led the offerors to propose battery solutions with significantly different technical capabilities and costs in response to what should have been a request for the same performance. The fact that the agency issued a Performance Specification and was depending upon offerors to design a product does not mean that offerors could fail to meet the tolerances in the Performance Specification and receive both enhanced technical and cost evaluation credit for doing so. It is undisputed that the alkaline battery for which Scott received enhanced evaluation credit failed to meet certain temperature, storage temperature, operational service life, and shelf life requirements. Further, these alkaline batteries could not have achieved equal or superior performance when they replaced the fully compliant lithium batteries, as mandated by the first high priority non-KPP requirement.

### The RFP's Lack of Clarity

The RFP set forth 178 mandatory performance specifications. The RFP advised offerors that six of those were "KPPs" or "Key Performance Parameters" which were "nontradeable." The other 172 were denominated "requirements," and while the solicitation cryptically suggested that some of them could be traded off, there was no indication as to what effect such a tradeoff would have in the evaluation of an offer.

The requirements of the Performance Specification which alkaline batteries failed to meet had all of the earmarks of minimum mandatory requirements, since they were stated to be threshold requirements and used the word "shall". Nonetheless, the Air Force and Scott argue that the RFP put offerors on notice that they did not have to meet the non-KPP threshold requirements and could have CAIV tradeoffs evaluated pre-award. The Air Force and Scott rely on paragraph L.4.1.2, Technical Performance and Operation Utility:

> Describe how the proposed designs will meet the following high priority non-KPP requirements ... for each aircraft category. Your presentation shall clearly discuss how your design meets the following requirements ... *rationale for not meeting the requirement (if applicable) and how you determine the optimal solution.*

There followed a list of twenty-three requirements which did not include the five specifications applicable to batteries. Scott and the Air Force also cite Paragraph M002(c)(2), which states that "[t]he Government will evaluate the ... proposed designs based upon the criteria in Section L, paragraph 4.1.2" and that the evaluation will consider "an assessment of the impact of non-KPP threshold requirements which will not be met."

The fact that an instruction in Section L confusingly told offerors to explain why certain minimum mandatory requirements were not being met did not sufficiently put offerors on notice that they could remain eligible for award by not meeting requirements and receive enhanced evaluation credit for presenting such noncompliance as a CAIV tradeoff. Nor was this made clear by Paragraph M002's statement that "failure to meet non-KPP requirements would be assessed," in light of numerous other provisions in the RFP.

Paragraph L.7.8 provided that offerors could take exception to requirements, but warned offerors that "failure to comply with the minimum requirements may result in the offeror being removed from consideration for award." Other RFP provisions indicated that offerors did have to meet non-KPP threshold requirements or risk being found unacceptable, such as "offerors are required to meet all solicitation requirements to be eligible for award" and "proposals with an unacceptable rating are not awardable." Further, Section M provided for award "to the offerors ... whose proposals *conform to the solicitation requirements*" and stated that "failure to comply with terms and conditions of the solicitation may result in the offeror being removed from consideration for award".

Nor was the fact that the CAIV tradeoff would be evaluated preaward evident from the solicitation. Importantly, the single paragraph in Section L of the Instructions to Bidders that expressly addressed CAIV suggested to offerors that the CAIV tradeoff would be done post-award. That clause read:

Offeror(s) shall describe their management approach for *identifying* tradeoffs to *evolve* a best value design. This includes a description of the tools or methodologies that *will be* used, why they were deemed appropriate for this program, and the method for documenting trade study results.

A management approach which "identifies" tradeoffs "to evolve" a best value design necessarily occurs during contract performance. The description of tools and methodologies that "will be used" also suggests a future tradeoff. Similarly, documenting trade study *results* would have to address the ramifications of CAIV tradeoffs actually implemented during performance. Finally, this paragraph was part of the instructions for preparing the management proposal—it was not part of the technical evaluation criteria or the performance specification, and contract management necessarily occurs post award. This paragraph cannot reasonably be interpreted to mean that specific CAIV tradeoffs would permit a waiver of non-KPP threshold requirements in exchange for lowered cost to be evaluated pre-award.

In response to a question by the Court as to what section of the solicitation disclosed to offerors that CAIV tradeoffs would be evaluated, the Air Force cited the RFP's Cross Reference Matrix, an attachment to the solicitation, as well as the clauses discussed above. Defendant's Response to Court's October 7, 2003 Order at 4. However, this matrix was nonbinding in the event of a conflict with any solicitation provision, and did not purport to disclose evaluation criteria, but simply cross-referenced the Section L instruction paragraphs with the evaluation factors for award. The matrix did not state that CAIV studies would be evaluated as part of any cost evaluation. Nor did it contain any explanation of how a CAIV tradeoff would be weighed in the evaluation in the event the vendor did not meet a threshold requirement, but was permitted to do a tradeoff. In short, there was no indication of the evaluation consequences associated with offering a CAIV tradeoff. In its Brief in Support of the United States' Motion for Summary Judgment (Scott's Brief), Scott admitted that "[o]fferors were not required to

conduct and submit complete detailed ... CAIV studies in their proposals." Scott's Brief at 23. Scott continued: "Offerors were simply required to describe their management approach for identifying tradeoffs to evolve a best value design." *Id.* It is precisely this ambiguous description of the CAIV process that benefitted Scott, but mislead Gentex.[15]

The law requires that evaluation factors and significant subfactors be clearly stated in an RFP, including the statement of the relative importance of such factors and subfactors. 41 U.S.C. § 253a(b)(1); FAR 15.304(d); *ITAC*, 51 Fed.Cl. at 348; *Analytical Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 44 (1997). Further, as this Court has recognized, "making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition." *Dubinsky v. United States*, 43 Fed.Cl. 243, 259 (1999). Here, the rules of the game were muddied, especially for Gentex, by virtue of the lack of clarity in the RFP, the explanatory discussions held only with Scott and the failure to advise Gentex that it had a differing interpretation of the fundamental basis on which this procurement was being conducted.

### Unequal Discussions

The discussions which the Air Force had with Gentex and Scott contributed to skewing the playing field in Scott's favor. Prior to the submission of its initial proposal, in recognition that its battery solution was expensive, Gentex, in an e-mail, expressed concern that its life cycle cost for the batteries was excessive that it had misinterpreted the instructions or that its calculations were incorrect. The Air Force did not respond to

Gentex's inquiry prior to the submission of initial proposals. Later, by e-mail dated August 28, 2002, the Air Force provided both Gentex and Scott with the battery assumptions regarding wear hours, duration of exposure to CB agents, percentage of cold weather operations, percentage of continuous wear and the number of hours in which there would be no battery change in warm weather. Nowhere in that e-mail did the Government advise vendors that they could substitute different batteries for different operations such as training or cold weather. In addition, the performance specifications did not clearly advise offerors that different batteries could be proposed for different environments and did not distinguish between training and non-training uses or cold-weather and warm-weather operations.

Following this e-mail, during discussions, the Air Force expressly advised Scott, but not Gentex, that it considered its proposed MPLCC to be unaffordable, and questioned Scott:

What alternative batteries were considered? Were any CAIV studies conducted? Was use of rechargeable batteries or aircraft power (in platforms where available) considered?

In response, Scott offered a dual-battery solution as a CAIV tradeoff in its FPR. In contrast, instead of advising Gentex that it could have offered a technically noncompliant product in a CAIV tradeoff, the Air Force reinforced Gentex's understanding of the RFP that it was required to offer full specification compliance. Specifically, Gentex requested exceptions to two threshold requirements, but the Air Force insisted

---

**15.** Indeed, there was an inconsistency in Scott's position regarding whether Scott's battery solution was evaluated as a CAIV tradeoff. At oral argument, counsel for Scott stated:

With regard to the operations and support costs worksheet, that's where it came out, and that was based on the assumptions that the government provided, so that really there was no cost, *there was no CAIV process applied to these batteries*. There was a question that Gentex has referred to early on, talking about have you done any CAIV studies for the batteries, but that didn't mean that our solution that we ended up proposing required a CAIV study to

select the batteries because we provided a lithium battery that was fully compliant.
Tr. at 127–28. In contrast, in its response to the Court's Oct. 6, 2003 Order, Scott stated:
The referenced GAO hearing testimony of Major Howard–Whitehurst, Chairperson of the Source Selection Evaluation Team ... states that *Scott's alkaline battery was viewed as a CAIV initiative.* This testimony is consistent with the subsequent testimony of the witness and is consistent with the terms of the solicitation.
The Air Force acknowledged that Scott's battery solution was a CAIV tradeoff.

that Gentex conform to the specifications, which it did.

In its proposal and during oral presentations, Gentex clearly specified that it would provide CAIV tradeoffs after award. The Air Force never corrected Gentex's fundamentally different understanding of the RFP requirements in discussions. Instead of telling Gentex that it could make the CAIV tradeoff preaward and submit a lower MPLCC proposal, the evaluators questioned Gentex regarding whether its proposal would be fully compliant with the applicable non-KPP threshold requirements, and Gentex reiterated that it would be.

As GAO has observed, "[w]here an agency fails to resolve an ambiguity during discussions which should have been reasonably detected and which materially prejudices an offeror, the agency has failed in its obligation to conduct meaningful discussions." *Am. Mgmt. Sys., Inc.*, 84–2 CPD ¶ 199 at 2, 1984 WL 46537 (1984); *see also Dynacs Eng'g Co., Inc. v. United States*, 48 Fed.Cl. 124, 131 (2000) (discussions must be meaningful and equal); *Biospherics, Inc. v. United States*, 48 Fed.Cl. 1, 9 (2000) ("discussions should be as specific as practical considerations permit" regarding areas needing correction); *Advanced Data Concepts, Inc. v. United States*, 43 Fed.Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054 (Fed.Cir.2000). While an agency has considerable discretion in conducting discussions with offerors, that discretion is not a license to mislead an offeror when the Government knows that an offeror's interpretation of the RFP is contrary, in a material way, to its own interpretation and that of a successful offeror. *Cf. ACRA v. United States*, 44 Fed.Cl. 288, 295–96 (1999) (holding that an agency was not required to hold discussions with an offeror about the possibility of using a phased implementation approach for project completion where the solicitation had expressly advised offerors that the agency desired "maximum acceleration of performance ... while minimizing disruption/downtime.")

The lack of clarity in the RFP, the discussions which suggested that Scott, but not Gentex, consider a CAIV tradeoff in connection with batteries, and the Air Force's failure to correct Gentex's differing understanding of the evaluation scheme of the RFP combined to render this procurement unfair. The Air Force violated the "fundamental principle of government procurement ... that [contracting officers] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation." *TLT Construction Corp. v. United States*, 50 Fed.Cl. 212, 216 (2001). It committed a clear and prejudicial violation of FAR 15.306(e), which provides Government personnel involved in the acquisition shall not engage in conduct that "[f]avors one offeror over another." 48 C.F.R. Section 15.306(e)(1) (2002).

The Air Force could have decided to allow noncompliance with what were otherwise stated to be "requirements" and conduct a CAIV tradeoff evaluation, so long as it adequately notified offerors. FAR 15.206(a) requires the contracting officer to amend the solicitation when "either before or after receipt of proposals, the Government changes its requirements or terms and conditions." As this Court reasoned in *Beta Analytics International, Inc. v. United States*, 44 Fed. Cl. 131, 139 (1999):

> A procuring agency is not without recourse if, after a solicitation is issued, it determines that a noncompliant proposal represents the best value to the Government
>
> . . . .
>
> . . . .
>
> If [the agency] concluded that an approach more creative or innovative than was permitted by the solicitation's terms represented the best value, [the agency] should have afforded all offerors the opportunity to amend their proposals in accordance with its mandate under the FAR.

*Accord MVM, Inc.*, 46 Fed.Cl. at 131–32; *Candle Corp. v. United States*, 40 Fed.Cl. 658, 663 (1998); *Systems Management, Inc.*, 2001 CPD ¶ 85 at 8, 2001 WL 474408.

**Was There Prejudice?**

In order to establish prejudice, Gentex must show that there was a substantial chance it would have received the contract award, but for the alleged error in the procurement process. *ITAC*, 316 F.3d at 1319 *(citing Alfa Laval Separation, Inc. v.*

*United States,* 175 F.3d 1365, 1367 (Fed.Cir. 1999)); *United Payors & United Providers Health Services, Inc. v. United States,* 55 Fed.Cl. 323, 332 (2003). In other words, the protestor must have been in the zone of active consideration and had a reasonable likelihood of securing the award. *Alfa Laval,* 175 F.3d at 1367; *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). Here, the Air Force failed to inform Gentex that it could have offered CAIV tradeoffs in its battery solution. If the Air Force had corrected Gentex's differing interpretation of the RFP requirements, Gentex could have offered its own CAIV tradeoffs for evaluation, elected not to meet certain non-KPP threshold requirements and lowered its evaluated price. Gentex's proposal was the only other proposal and it was technically acceptable and eligible for award. Under the circumstances, Gentex has established prejudice because it had greater than an insubstantial chance of securing the contract but for the Air Force's errors. *ITAC,* 316 F.3d at 1319; *United Payors,* 55 Fed.Cl. at 332.

### What Should the Remedy Be?

#### Injunctive Relief

Gentex argues that the Court should direct contract award to it since it had an acceptable offer and, but for the illegal behavior of the Air Force, it would have received the contract because the Air Force was required to exclude Scott from the SDD procurement. The Court disagrees. The unfairness in this procurement occurred when the Air Force, realizing that Gentex believed it could not do a CAIV tradeoff in the evaluation phase, failed to advise Gentex of the Government's different interpretation and awarded to Scott, which had submitted its proposal on that basis. The traditional remedy for a procurement error of this kind is not a directed award, but a recompetition with all players enjoying an equal playing field in a way that the Government obtains its true best value at a benefit to the taxpayers. *United Payors,* 55 Fed.Cl. at 334 (ordering termination of awarded contract and allowing the Government to resolicit bids); *cf. ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. 489, 509 (1997) (enjoining continued performance of a legally defective procurement and authorizing reprocurement in a flexible manner so as to avoid harm to military readiness).

To obtain a permanent injunction, a party must show that: (1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest. *See Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. 303, 320–21 (2000); *see also Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000) *aff'd,* 10 Fed.Appx. 957 (Fed.Cir.2001). No one factor is dispositive, and "the weakness of the showing of one factor may be overborne by the strength of others." *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993).

Because Plaintiff has succeeded on the merits of its case, this factor weighs in Plaintiff's favor. Gentex contends that it will be irreparably harmed because it will lose the opportunity to earn the profit it would have made under this contract. Such loss of profit stemming from a lost opportunity to compete on a level playing field has been found sufficient to constitute irreparable harm. *United Payors,* 55 Fed.Cl. at 333 (citations omitted); *MVM, Inc.,* 46 Fed.Cl. at 143.

In considering whether the balance of the hardships tips in the favor of a plaintiff in a post-award bid protest, a court must balance the potential harm to the plaintiff of not granting the injunction against the potential harm to both the Government and the awardee should the injunction be granted. *ESKO v. United States,* 44 Fed.Cl. 429, 435 (1999). The Court recognizes that generally the public interest is served by ensuring fair and open competition in the procurement process. *Cincom Sys. v. United States,* 37 Fed.Cl. 266, 269 (1997) (*citing Magellan Corp. v. United States,* 27 Fed.Cl. 446, 448 (1993)). However, the harm to Gentex and the systemic, long-term interest which the public has in the integrity of the procurement process must be weighed against potential damage to the public interest from other causes.

The Tucker Act requires that the Court consider the interest of national defense in its bid protest decisions. 28 U.S.C. § 1491(b)(3) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security . . . ."); *see also Cincom Sys. Inc.,* 37 Fed.Cl. at 269 ("[g]iven the importance of military preparedness to the national defense, the balance of harms tips in defendant's favor."). Nonetheless, "claims of national security . . . are often advanced by the Government in challenges to procurement decisions. The Court will not blindly accede to such claims but is bound to give them the most careful consideration." *Harris Corp. v. United States,* 628 F.Supp. 813, 822 n. 13 (D.D.C.1986) (citation omitted). While the Court certainly must give serious consideration to national defense concerns and arguably should err on the side of caution when such vital interests are at stake, allegations involving national security must be evaluated with the same analytical rigor as other allegations of potential harm to parties or to the public. *ATA Defense Industries, Inc.,* 38 Fed.Cl. at 506 (*citing Magnavox Electronic Systems Co. v. United States,* 26 Cl.Ct. 1373, 1384 (1992)).

The Air Force has determined that "the JSAM is an urgent requirement for the Air Force flying mission." AR at 2621. A delay in the JSAM procurement would adversely impact the nation's high-performance aircrews "reducing their warfighting potential by exposing them to additional risks of CB exposure when using the current anti-G masks, or G-induced loss of consciousness when using the current CB masks." *Id.* According to the Air Combat Command, delaying the JSAM procurement may result in aircrew "not having a continuous NBC protection program and systematically not meeting combat mission requirements." *Id.*

Recognizing that initial operational capability is almost three years away, the Air Force nonetheless determined that the current program schedule does not have available slack time to recover a delay of more than thirty days. Lt. Gen. Reynolds also determined that a delay would adversely affect Navy and Marine Corps aircrew who are also slated to use JSAM, and in particular that a 90–day delay would create a void in serviceable systems for the Navy and Marine Corps, and result in a 6–month schedule slip.

Further, Lt. Gen. Reynolds determined that a delay in this procurement would impact the F/A–22 and Joint Strike Fighter (JSF) programs which must be integrated with JSAM in terms of aircraft design. Plaintiff disagrees. Gentex's vice president and general manager admits that the JSAM is intended to operate in both those aircraft, but opines that "it is ridiculous to suggest that . . . the JSAM is in any manner a schedule driver on those programs and notes that the F/A–22 and Joint Strike Fighter have been beset with delays," citing a March 2003 GAO Report. Second McCay Affidavit, ¶¶ 13, 14, and Attachment A.

Even accepting Gentex's contention that a delay in JSAM might not affect operational schedules on the F/A–22 and JSF programs, the Air Force's override determination has established the urgency and critical importance of the JSAM program on its own. In *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 56 Fed.Cl. 502, 521–22 (2003), the Court denied injunctive relief on national security grounds where the contract involved construction of housing for U.S. military personnel in Kuwait. In that case, the Court found that the defendant's national security argument was "of paramount import" where the Government's override of GAO's stay stated that the slightest delay in the contract would have a "direct and tangible impact on [the military's] ability to receive and prepare the soldiers for combat." *Id.* at 522.

Although the instant case does not involve as direct and intractable an urgency as *Al Ghanim,* the Air Force here has determined that the JSAM procurement is urgent, and that delay in the operational capability would adversely impact the capability of military aircrew and reduce their warfighting capability. There is no basis upon which this Court can conclude that the Air Force's determination in this regard is arbitrary, capricious or irrational. The Court cannot conclude, as it recently did in *PGBA, LLC v. United States,* 57 Fed.Cl. 655, 661 (2003), that the assump-

tions underlying the determination are "so implausible as not to be the product of rational decisionmaking." Unlike *PGBA*, this Court cannot conclude that the Government's assertion that a delay in this procurement could lead to a void in coverage of items being procured is "completely without foundation." *Id.* At 662. Given that the product being acquired is critical to protect the nation's aircrew against chemical, biological and nuclear threats, and that the Air Force has determined it to be an urgent requirement with no slack time available in the procurement schedule, the Court deems it prudent to deny injunctive relief. Where a solicitation addresses issues of national defense, as it does here, the importance of this factor is inflated. *See CSE Construction Co., Inc. v. United States*, 58 Fed.Cl. 230 (2003) (holding that national security concerns and the balance of the equities tipped the scales decisively against injunctive relief in a case, where a contract for firing range renovations, if delayed, would raise national defense concerns); *Computer Sciences Corp. v. United States*, 51 Fed.Cl. 297, 323 (2002) (because of national security concerns, injunctive relief would be denied even if the plaintiff could have succeeded on the merits due to national security considerations); *Cincom Sys., Inc.*, 37 Fed.Cl. at 269 (stating that the public interest "militates against awarding injunctive relief when national defense and national security interests are concerned") (*citing Southwest Marine, Inc. v. United States*, 3 Cl.Ct. 611, 613 (1983)); *see also Rockwell Intern. Corp. v. United States*, 4 Cl.Ct. 1 (1983) (denying injunctive relief where communications systems involved were urgently required, without further delay, in the interests of national defense and national security).

The form of injunctive relief which would remedy the errors in this procurement—the issuance of an amendment to the RFP, a new round of FPRs, a new evaluation with a possible new awardee, and perhaps resultant termination costs and transition delays—would necessarily substantially delay performance. It is the judgment of this Court that this critical procurement cannot tolerate such disruption and delay.

### *Bid Preparation Costs*

Under the Tucker Act, the Court is empowered to award monetary relief in post-award bid protests "limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(3). As this Court recently recognized in *CSE Construction Co., Inc.*, 58 Fed. Cl. 230, 262–63 (2003), a losing competitor may recover the costs of preparing its unsuccessful proposal if it can establish that the Government's consideration of the proposal submitted was arbitrary or capricious or in violation of applicable statute or regulation. As such, Gentex may recover its bid preparation and proposal costs in an amount to be determined after further proceedings in this action.

### *CONCLUSION*

Plaintiff has demonstrated that the Air Force's conduct of this procurement violated FAR 15.306(e). However, Plaintiff has not met its burden of demonstrating that injunctive relief is warranted, given the urgency of this procurement for the nation's military.

Accordingly, based on the foregoing:

1. Plaintiff's Protective Motion to Allow Affidavits is **GRANTED.**

2. Defendant's Motion for Judgment Upon the Administrative Record is **DENIED.**

3. Plaintiff's Motion for Judgment Upon the Administrative Record is **GRANTED in part.**

4. Plaintiff's request for a permanent injunction is **DENIED.**

5. Plaintiff may recover its reasonable bid and proposal preparation costs in an amount to be determined after further proceedings in this action. Unless the parties can agree on Plaintiff's bid preparation costs by filing a Joint Stipulation, Plaintiff shall file a detailed statement of its costs with supporting documentation on or before **January 15, 2004.** In response to Plaintiff's amplified statement of bid preparation costs, Defendant may either file an opposition or request discovery. Any such request for discovery shall be supported by a showing of need. Defendant's request for discovery shall be filed by **February 2,**

2004. In the event Defendant does not require discovery, its opposition to Plaintiff's amplified statement of bid preparation costs shall be filed by **February 17, 2004.**

6. Prior to the release of this opinion to the public, the parties shall review this unredacted opinion for competition-sensitive, proprietary, confidential or other protected information. The parties shall file proposed redacted versions of this decision by **December 10, 2003.**

**IT IS SO ORDERED.**